UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

June 06, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ SO

DEPUTY

UNITED STATES OF AMERICA
**Plaintiff**

**v**

**NATIN PAUL**
**a/k/a Nate Paul**

**Defendant**

**1:23-CR-100-DAE**

**INDICTMENT**

**[Cts. 1-8: 18 U.S.C. § 1014 –**
**False Statements to Lenders]**

**THE GRAND JURY CHARGES:**

**Introduction and Summary**

1.      Defendant,

**Natin Paul a/k/a Nate Paul,**

is a commercial real estate investor based in Austin, Texas in the Western District of Texas.

2.      Paul has founded and controls numerous companies that engage in the commercial real estate business.  The names of many of Paul's companies include the words "World Class" or the letters "WC."

3.      When Paul establishes a company for the purpose of owning a particular parcel of real estate, the name of the company often includes the street address of the property, such as "WC 56 East Avenue, LLC," or the name of the property, such as "WC Met Center, LLC."

4.      When Paul acquires real estate through one of his companies, he customarily finances part of the purchase price by arranging for a financial institution to make a loan to the company that will own the property, or to an affiliated company.

5.      From March 2017 through April 2018, Paul made a number of false statements and reports for the purpose of influencing financial institutions to make loans to Paul's companies.  The combined principal amount of the loans that Paul obtained was approximately $172,000,000.

6.      On three occasions, Paul gave a financial institution a false and counterfeit document, representing that one of Paul's bank accounts held millions of dollars when in fact the balance of the account was less than $13,000.

7.      On other occasions, Paul under-represented the amount of his liabilities or over-represented the amount of cash that he had.

8.      In one instance, Paul falsely represented that he indirectly held 100% of the limited liability company interests in the company that was the borrower on the loan, whereas Paul knew that a company of which the lender was unaware, which Paul neither owned nor controlled, held a 91% limited liability company interest in the parent of the borrower and had certain undisclosed rights of control over the borrower.

### Background – Lender Due Diligence

9.      At all times relevant to this Indictment, the following were true.

10.      Financial institutions (hereafter "lenders") made loans only after investigating the risk that the borrower might fail to repay the funds or otherwise fail to comply with the terms of the loan agreement.

11.      Lenders obtained the pertinent information through a process that was sometimes referred to as "due diligence" or "underwriting."  As part of that process, the lender requested information from the borrower.

12.     Among other matters, lenders inquired about the financial condition of the borrower.

13.     If the borrower was an organization established for a limited business purpose, such as owning and managing a single parcel of real estate, the lender inquired about the financial condition of any organization or individual, sometimes referred to as a "sponsor," that had a substantial ownership interest in or substantial control over the borrower.

14.     Lenders customarily inquired about the amount of money or "cash" that the borrower or sponsor held, as well as property that the borrower or sponsor could readily convert into cash. The cash and the property that was readily convertible to cash were often referred to as the borrower or sponsor's "liquidity."

15.     Lenders also customarily inquired about the amount of debt that the borrower or sponsor owed.

16.     If the purpose of a loan was to purchase or refinance real estate, the lender typically had the right to take possession of the real estate if the borrower failed to satisfy certain terms of the loan agreement, including repayment of the loan. That right was known as a "mortgage" or "security interest," and loans secured by an interest in real estate were commonly called "mortgage loans."

### Pertinent Statutes

17.     Section 1014 of Title 18 of the United States Code ("Section 1014") provides that a person commits a crime if he or she "knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... an insured State-chartered credit union ... or a mortgage lending business ... upon any application, advance, ... commitment, [or] loan ...."

18.     Section 1014 provides that the term "State-chartered credit union" includes "a credit union chartered under the laws of a State of the United States."

19.     Section 27 of Title 18 of the United States Code provides that the term "mortgage lending business" (hereafter "MLB") means "an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce."

### Lenders and Affiliates

At all times relevant to this Indictment, the following were true.

20.     A credit union known to the Grand Jury (hereafter "the Credit Union") was chartered under the laws of the State of Texas and did business in Austin, Texas.  The Credit Union's members' deposits were insured by the National Credit Union Administration, an independent agency of the United States.

21.     An Irish lender known to the Grand Jury (hereafter "the Ireland MLB") was in the business of financing and refinancing debt secured by interests in real estate, and its activities affected interstate and foreign commerce.  Therefore, it was a "mortgage lending business" as defined by Section 27 of Title 18 of the United States Code.

22.     A California firm known to the Grand Jury (hereafter "the California Advisor") acted as an agent for and advisor to the Ireland MLB in relation to mortgage loans made by the Ireland MLB.  Among other functions, the California Advisor performed due diligence related to loans made by the Ireland MLB.

23.     A Greenwich, Connecticut lender known to the Grand Jury (hereafter "the Connecticut MLB") was in the business of financing and refinancing debt secured by interests in

real estate, and its activities affected interstate and foreign commerce. Therefore, it was a "mortgage lending business" as defined by Section 27 of Title 18 of the United States Code.

24.     An affiliate of the Connecticut MLB known to the Grand Jury (hereafter "the Chicago Affiliate") had offices in Chicago, Illinois and performed due diligence related to mortgage loans made by the Connecticut MLB.

25.     A New York, New York lender known to the Grand Jury (hereafter "the New York MLB") was in the business of financing and refinancing debt secured by interests in real estate, and its activities affected interstate and foreign commerce. Therefore, it was a "mortgage lending business" as defined by Section 27 of Title 18 of the United States Code.

## Count One
### False Statement and Report to Insured State-Chartered Credit Union
### [18 U.S.C. § 1014]

26.     Paragraphs 1 through 20 above are incorporated into this Count by reference as if fully set forth herein.

27.     On or about March 14, 2017, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the Credit Union upon an application, advance, commitment, and loan. Specifically, Paul stated and reported to representatives of the Credit Union that he held "$31.6 million" in cash in a specific account numbered ***-*0767 (hereafter "the 767 Account"). In fact, however, as Paul knew, that account held less than $500,000 in cash, and the remainder of the assets in the account were securities.

28.     In March 2017, Paul was seeking two loans from the Credit Union.

a. One was a $2,713,252 loan from the Credit Union to WC 707 Cesar Chavez, LLC, a company Paul directly or indirectly owned and controlled.

b. The other was a $6,540,000 loan from the Credit Union to WC Custer Creek Center Property, LLC, a company Paul directly or indirectly owned and controlled.

c. The Credit Union made the loans to WC 707 Cesar Chavez, LLC and WC Custer Creek Center Property, LLC in or about April 2017.

29. On March 14, 2017, a representative of the Credit Union in Austin, Texas emailed Paul. He asked whether Paul could "provide bank statements" for "the largest cash balances" making up "$32 million in cash" that Paul had listed among his assets on a personal financial statement. Paul replied, "Yes".

30. Later on March 14, 2017, the Credit Union's representative emailed Paul "a consolidated list of outstanding items" for the Credit Union's due diligence, which included "Bank statements for largest cash balances."

31. Paul replied, stating, "Attached is my account statement from today … with a balance of $31.6 million." To his email, Paul attached a screen shot from a bank Internet site, showing $31,681,316.43 in the 767 Account on March 14, 2017.

32. Paul knew that the 767 Account held less than $500,000 in cash, and that the remainder of the account's value consisted of securities. Therefore, Paul knowingly made a false statement and report when he represented that the 767 Account held $31.6 million in cash.

33. Paul knowingly made that false statement and report for the purpose of influencing the action of the Credit Union on Paul's application for the loans to WC 707 Cesar Chavez, LLC and WC Custer Creek Center Property, LLC.

In violation of 18 U.S.C. § 1014.

### Count Two
### False Statement and Report to Mortgage Lending Business
### [18 U.S.C. § 1014]

34.     Paragraphs 1 through 19 and 21 through 22 above are incorporated into this Count by reference as if fully set forth herein.

35.     On or about December 10, 2017, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the Ireland MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that, as of November 30, 2017, he owed only $3,422,056 in "Total liabilities."  In fact, however, as Paul knew, he owed on November 30, 2017, directly or indirectly, at least $28,620,000 in addition to the liabilities he disclosed.

36.     In December 2017, Paul was seeking a $15,000,000 loan from the Ireland MLB to WC 56 East Avenue LLC, a company Paul directly or indirectly owned and controlled.   The Ireland MLB made the loan to WC 56 East Avenue LLC on or about December 12, 2017.

37.     On or about December 10, 2017, the California Advisor was acting on behalf of the Ireland MLB, conducting due diligence in relation to the loan to WC 56 East Avenue LLC, when Paul sent an email from Austin, Texas to a representative of the California Advisor.

38.     Paul's email stated, "Attached is my personal financial statement...."  A two-page document attached to the email, entitled "Natin Paul - Statement of Financial Condition - November 30, 2017," listed "Assets" in one section and "Liabilities" in another section.

39.     The "Liabilities" section listed Paul's "Total liabilities" as $3,422,056.  On or about December 10, 2017, however, Paul knew that on November 30, 2017 he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities that the personal financial statement

disclosed.  Therefore, Paul knowingly made a false statement and report when he said that the amount of his total liabilities was only $3,422,056.

40.     Paul knowingly made that false statement and report for the purpose of influencing the action of the Ireland MLB on Paul's application for the loan to WC 56 East Avenue LLC.

In violation of 18 U.S.C. § 1014.

### Count Three
### False Statement and Report to Mortgage Lending Business
### [18 U.S.C. § 1014]

41.     Paragraphs 1 through 19 and 21 through 22 above are incorporated into this Count by reference as if fully set forth herein.

42.     On or about December 11, 2017, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the Ireland MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that a document Paul provided to the California Advisor "for verification of liquidity," reflecting an account value of $14,203,464.39, was part of the November 30, 2017 statement of a specific account numbered ***-*5175 and held by Paul (hereafter "the 5175 Account").  In fact, however, as Paul knew, the document he sent was false and counterfeit, and the genuine November 30, 2017 statement of the 5175 Account reflected a true account value less than $13,000.

43.     Paul held the 5175 Account at a wealth management firm known to the Grand Jury that did business in Century City, California (hereafter "the Century City Firm").  Paul alone held and controlled the 5175 Account.

44.     In December 2017, as described in Count Two above, Paul was seeking a $15,000,000 loan from the Ireland MLB to WC 56 East Avenue LLC, and the California Advisor was performing due diligence on behalf of the Ireland MLB in relation to the loan. The Ireland MLB made the loan to WC 56 East Avenue LLC on or about December 12, 2017.

45.     On December 10, 2017, as described in Count Two above, a representative of the California Advisor received Paul's personal financial statement from Paul. Among the assets listed was "Cash in banks" with a value of "$13,250,000."

46.     On December 11, 2017, Paul sent an email from Austin, Texas to the California Advisor's representative, stating, "Per your request, attached is my [Century City Firm] statement for verification of liquidity."

47.     Attached to the email was a single page labeled "Page 1 of 5" of an "Account Statement" from the Century City Firm. The "Statement" purported to relate to the 5175 Account and the period "November 1, 2017 – November 30, 2017."

48.     The page included the following section entitled "Account Value Summary":

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
| --- | --- | --- |
| Beginning account value | $14,186,251.74 | $0.00 |
| Deposits | 0.00 | 15,300,000.00 |
| Withdrawals | 0.00 | -1,290,000.00 |
| Taxable income | 17,212.65 | 193,464.39 |
| Ending account value | $14,203,464.39 | $14,203,464.39 |

49.     The document that Paul attached to his December 11, 2017 email was not, as he stated and reported to the California Advisor's representative, his "statement" or a true copy of part of his statement. As Paul knew on or about December 11, 2017, the document he sent was

false and counterfeit, and the dollar figures in the "Account Value Summary" were not the true

dollar figures that appeared in the genuine November 30, 2017 statement for the 5175 Account.

50.     In the genuine November 30, 2017 statement for the 5175 Account, the "Account

Value Summary" is the following:

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
|---|---|---|
| Beginning account value | $12,099.39 | $0.00 |
| Deposits | 0.00 | 8,300,000.00 |
| Withdrawals | 0.00 | −8,291,361.39 |
| Taxable income | 2.65 | 3,463.43 |
| Ending account value | $12,102.04 | $12,102.04 |

51.     Therefore, Paul knowingly made a false statement and report when he said that

the document he sent to the California Advisor's representative was a statement of the 5175

Account.

52.     Paul knowingly made that false statement and report for the purpose of

influencing the action of the Ireland MLB on his application for the loan to WC 56 East Avenue

LLC.

In violation of 18 U.S.C. § 1014.

## Count Four
### False Statement and Report to Mortgage Lending Business
### [18 U.S.C. § 1014]

53.     Paragraphs 1 through 19, 23 through 24, and 47 through 50 above are

incorporated into this Count by reference as if fully set forth herein.

54.     On or about December 11, 2017, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the Connecticut MLB upon an application, advance, commitment, and loan. Specifically, Paul stated and reported that a document Paul provided to the Chicago Affiliate "for the last outstanding item needed for evidence of liquidity," reflecting an account value of $14,203,464.39, was part of the November 30, 2017 statement of a specific account numbered ***-*5175 and held by Paul (hereafter "the 5175 Account"). In fact, however, as Paul knew, the document he sent was false and counterfeit, and the genuine November 30, 2017 statement of the 5175 Account reflected a true account value less than $13,000.

55.    Paul held the 5175 Account at a wealth management firm known to the Grand Jury that did business in Century City, California (hereafter "the Century City Firm"). Paul alone held and controlled the 5175 Account.

56.    In December 2017, Paul was seeking a $33,600,000 loan from the Connecticut MLB to WC South Congress Square, LLC, a company Paul directly or indirectly owned and controlled. The Connecticut MLB made the loan to WC South Congress Square, LLC on or about December 14, 2017.

57.    In December 2017, the Chicago Affiliate was performing due diligence on behalf of the Connecticut MLB in relation to the loan to WC South Congress Square, LLC.

58.    On or about December 11, 2017, Paul sent an email from Austin, Texas to a representative of the Chicago Affiliate, stating, "Attached is my [Century City Firm] statement for the last outstanding item needed for evidence of liquidity. Look forward to closing this transaction."

59.    Attached to Paul's email was the same false and counterfeit document described in Count Three above, reflecting an account value of $14,203,464.39 in the 5175 Account.

60.     The document that Paul attached to his December 11, 2017 email was not, as he stated and reported to the Chicago Affiliate's representative, his "statement" or a true copy of part of his statement. As Paul knew, on or about December 11, 2017, the document he sent was false and counterfeit, and the dollar figures in the "Account Value Summary" were not the true dollar figures that appeared in the genuine November 30, 2017 statement for the 5175 Account.

61.     In the genuine November 30, 2017 statement for the 5175 Account, the "Account Value Summary" reflects the amount $12,102.04, as described in Count Three above. Therefore, Paul knowingly made a false statement and report when he said that the document he sent to the Chicago Affiliate's representative was part of a statement of the 5175 Account.

62.     Paul knowingly made that false statement and report for the purpose of influencing the action of the Connecticut MLB on his application for the loan to WC South Congress Square, LLC.

In violation of 18 U.S.C. § 1014.

## Count Five
## False Statement and Report to Mortgage Lending Business
## [18 U.S.C. § 1014]

63.     Paragraphs 1 through 19 and 25 above are incorporated into this Count by reference as if fully set forth herein.

64.     On or about December 20, 2017, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the New York MLB upon an application, advance, commitment, and loan. Specifically, Paul stated and reported that, as of November 30, 2017, he held $25,250,000 of "Cash in banks" and owed only $3,422,056 in "Total liabilities." In fact, however, as Paul knew, he held substantially less than

$25,250,000 of cash and owed, directly or indirectly, at least $28,620,000 in addition to the liabilities he disclosed.

65.     In December 2017, Paul was seeking a $64,000,000 loan from the New York MLB to Silicon Hills Campus, LLC (hereafter "Silicon Hills"), a company Paul then directly or indirectly owned and controlled, for the purchase of 158 acres and several buildings in northwest Austin. The New York MLB made the loan to Silicon Hills on or about February 6, 2018.

66.     In December 2017, the New York MLB was conducting due diligence in relation to the loan to Silicon Hills.

67.     On or about December 20, 2017, Paul sent an email from Austin, Texas to a representative of the New York MLB, stating, "Attached is my Personal Financial Statement .... Please contact me directly with any questions." A two-page document attached to the email was entitled "Natin Paul - Statement of Financial Condition - November 30, 2017."

68.     That document was nearly identical to the personal financial statement that Paul sent to the California Advisor on December 10, 2017, when Paul was seeking a loan from the Ireland MLB, as described in Count Two and Count Three above.

69.     The November 30, 2017 personal financial statement that Paul sent to the New York MLB on December 20, 2017 differed from the earlier November 30, 2017 personal financial statement mainly in that the amount of "Cash in banks" on the version received by the New York MLB was $25,250,000 rather than $13,250,000. (The "Total Assets" and "Net worth" figures also increased.)

70.     On or about December 20, 2017, Paul knew that, on November 30, 2017, he held substantially less than $25,250,000 in cash.

71.     Like the earlier version of the November 30, 2017 personal financial statement, the version that Paul sent to the New York MLB on December 20, 2017 reported "Total liabilities" of $3,422,056.

72.     On or about December 20, 2017, however, Paul knew that, on November 30, 2017, he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities that his personal financial statement disclosed.

73.     Therefore, Paul knowingly made a false statement and report when he represented that, on November 30, 2017, he held $25,250,000 of cash and owed total liabilities of only $3,422,056.

74.     Paul knowingly made that false statement and report for the purpose of influencing the action of the New York MLB on his application for the loan to Silicon Hills.

In violation of 18 U.S.C. § 1014.

**Count Six**
**False Statement and Report to Mortgage Lending Business**
**[18 U.S.C. § 1014]**

75.     Paragraphs 1 through 19 and 25 above are incorporated into this Count by reference as if fully set forth herein.

76.     On or about February 6, 2018, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the New York MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that he indirectly held, through a series of companies, 100% of the limited liability company interests in Silicon Hills Campus, LLC (hereafter "Silicon Hills"), the borrower on a $64,000,000 loan from the New York MLB, and that no parties other than ones that Paul wholly

owned and controlled had any right of control over Silicon Hills.  In fact, as Paul knew, a limited liability company known to the Grand Jury that had its principal place of business in Los Angeles, California (hereafter "the LA LLC") held a 91% limited liability company interest in World Class Holdings VII, LLC (hereafter "WCH VII"), which directly held 100% of the limited liability company interests in Silicon Hills, and the LA LLC also had certain rights of control over Silicon Hills.

77.     In February 2018, Paul obtained a $64,000,000 loan from the New York MLB to Silicon Hills for the purchase of 158 acres and several buildings in northwest Austin, Texas (hereafter "the Silicon Hills property").

78.     On or about February 6, 2018, in Austin, Texas, Paul, acting as President of Silicon Hills, signed the Loan Agreement for the loan to Silicon Hills.

79.     In a section of the Loan Agreement entitled "Borrower Representations," the "Borrower represent[ed] and warrant[ed] to Lender" that an "organizational chart attached as Schedule IV hereto, relating to Borrower and certain Affiliates and other parties, is true, complete, and correct on and as of the date hereof.  No person other than those Persons shown on Schedule IV have any ownership interest in, or right of Control, directly or indirectly, in Borrower."

80.     The organizational chart that was attached to the Loan Agreement as Schedule IV appears on the next page of this Indictment.  It reflected that Paul wholly owned World Class Holding Company, LLC, which wholly owned World Class Holdings, LLC, which wholly owned WCH VII, which wholly owned Silicon Hills.

<u>**SCHEDULE IV**</u>

<u>**ORGANIZATIONAL CHART**</u>



\*\*All entities are Delaware limited liability companies

S-IV-1

EAST\149310333.9

81.   That organizational chart, and the Borrower Representation about its accuracy and completeness, were false.

82.   On or about February 6, 2018, Paul, as the President of World Class Holdings, LLC, the Managing Member of WCH VII, signed an Amended and Restated Limited Liability Company Agreement for WCH VII.  Under that agreement, as Paul knew:

     a.   the LA LLC, a company in which Paul had no ownership interest and over which he had no control, became the Class B Member of WCH VII;

     b.   the LA LLC contributed more than $14,500,000 toward the purchase of the Silicon Hills property;

     c.   the LA LLC held a 91% limited liability company interest in WCH VII;

     d.   the LA LLC directly or indirectly held certain rights of control over Silicon Hills, including, among other rights, the right under certain circumstances to force WCH VII, as the manager of Silicon Hills, to cause the sale of the Silicon Hills property and use the sale proceeds to pay amounts owed to the LA LLC; and

     e.   World Class Holdings, LLC held only a 9% limited liability company interest in WCH VII.

83.   Therefore, by signing the Loan Agreement, Paul knowingly made a false statement and report that he indirectly held 100% of the limited liability company interests in Silicon Hills, and that no parties other than ones that Paul wholly owned and controlled had any right of control over Silicon Hills.  Paul knew that the LA LLC, which did not appear on the organizational chart and was unknown to the New York MLB, held a 91% limited liability company interest in WCH VII, the holder of 100% of the limited liability company interests in Silicon Hills, and directly or indirectly held certain rights of control over Silicon Hills.

84.     Paul knowingly made that false statement and report, on or about February 6, 2018, for the purpose of influencing the action of the New York MLB on Paul's application for the $64,000,000 loan to Silicon Hills.

In violation of 18 U.S.C. § 1014.

### Count Seven
### False Statement and Report to Insured State-Chartered Credit Union
### [18 U.S.C. § 1014]

85.     Paragraphs 1 through 20 above are incorporated into this Count by reference as if fully set forth herein.

86.     On or about March 27, 2018, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the Credit Union upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that, as of March 1, 2018, he owed only $3,307,281 in "Total liabilities."  In fact, as Paul knew, he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities he disclosed.

87.     In March 2018, Paul was seeking a $2,730,000 loan from the Credit Union to WC Alamo Industrial Center, LP, a company Paul directly or indirectly controlled.  The Credit Union made the loan to WC Alamo Industrial Center, LP in or about May 2018.

88.     On or about March 27, 2018, the Credit Union was conducting due diligence in relation to the loan, when Paul sent an email to representatives of the Credit Union in Austin, Texas, stating, "Attached is my updated PFS.  Please let me know if you have any questions.  We look forward to closing this transaction with you."

89.     A two-page document attached to the email was entitled "Natin Paul - Statement of Financial Condition – March 1, 2018." At the end of the "Liabilities" section, Paul's "Total liabilities" were listed as $3,307,281.

90.     On or about March 27, 2018, however, Paul knew that on March 1, 2018 he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities that his personal financial statement disclosed.

91.     Therefore, Paul knowingly made a false statement and report when he said that the amount of his "Total liabilities" was only $3,307,281.

92.     Paul knowingly made that false statement and report for the purpose of influencing the action of the Credit Union on his application for the loan to WC Alamo Industrial Center, LP.

In violation of 18 U.S.C. § 1014.

**Count Eight**
**False Statement and Report to Mortgage Lending Business**
**[18 U.S.C. § 1014]**

93.     Paragraphs 1 through 19 and 23 through 24 above are incorporated into this Count by reference as if fully set forth herein.

94.     On or about April 19, 2018, in the Western District of Texas, Defendant,

**Natin Paul a/k/a Nate Paul,**

knowingly made a false statement and report for the purpose of influencing the action of the Connecticut MLB upon an application, advance, commitment, and loan. Specifically, Paul stated and reported that a document Paul provided to the Chicago Affiliate "for evidence of liquidity," reflecting an account value of $18,566,363.98, was part of the March 31, 2018 statement of a specific account numbered ***-*5175 and held by Paul (hereafter "the 5175

Account"). In fact, however, as Paul knew, that document was false and counterfeit, and the genuine March 31, 2018 statement of the 5175 Account reflected a true account value less than $13,000.

95.     Paul held the 5175 Account at a wealth management firm known to the Grand Jury that did business in Century City, California (hereafter "the Century City Firm"). Paul alone held and controlled the 5175 Account.

96.     In April 2018, Paul was seeking a $48,200,000 loan from the Connecticut MLB to WC Met Center, LLC, a company Paul directly or indirectly owned and controlled. The Connecticut MLB made the loan to WC Met Center, LLC on or about April 19, 2018.

97.     In April 2018, the Chicago Affiliate was performing due diligence on behalf of the Connecticut MLB in relation to the loan.

98.     On or about April 19, 2018, Paul sent an email message from Austin, Texas to a representative of the Chicago Affiliate, stating, "Attached is my most recent [Century City Firm] statement for evidence of liquidity. Look forward to closing this transaction."

99.     Attached to Paul's email was a single page labeled "Page 1 of 5" of an "Account Statement" from the Century City Firm. The "Statement" purported to relate to the 5175 Account and the period "March 1, 2018 – March 31, 2018."

100.     The page included the following section entitled "Account Value Summary":

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
|---|---|---|
| Beginning account value | $18,476,578.44 | $18,279,050.25 |
| Taxable income | 89,785.54 | 287,313.73 |
| Ending account value | $18,566,363.98 | $18,566,363.98 |

101.    The document that Paul attached to his April 19, 2018 email was not, as he stated and reported to the Chicago Affiliate's representative, his "statement" or a true copy of part of his statement.  As Paul knew on or about April 19, 2018, the document he sent was false and counterfeit in that the dollar figures in the "Account Value Summary" were not the true dollar figures that appeared in the genuine March 31, 2018 statement for the 5175 Account.

102.    In the genuine March 31, 2018 statement for the 5175 Account, the "Account Value Summary" is the following:

| ACCOUNT VALUE SUMMARY | THIS PERIOD | THIS YEAR |
|---|---|---|
| **Beginning account value** | $12,113.10 | $12,104.44 |
| Taxable income | 4.18 | 12.84 |
| **Ending account value** | $12,117.28 | $12,117.28 |

103.    Therefore, Paul knowingly made a false statement and report when he said that the document he sent to the Chicago Affiliate's representative was part of a statement of the 5175 Account.

104.    Paul knowingly made that false statement and report for the purpose of influencing the action of the Connecticut MLB on his application for the $48,200,000 loan to WC Met Center, LLC.

In violation of 18 U.S.C. § 1014.

## Notice of Government's Demand for Forfeiture
### [*See* Fed. R. Crim. P. 32.2]

### I.
### False Statements and Reports to Lenders
### Violation and Forfeiture Statutes
### [18 U.S.C. § 1014, subject to forfeiture pursuant to 18 U.S.C. § 982(a)(2)]

As a result of the criminal violations set forth above, the United States gives notice to

Defendant **Natin Paul a/k/a Nate Paul** of its intent to seek the forfeiture of certain properties

upon conviction pursuant to Fed. R. Crim. P. 32.2 and 18 U.S.C. § 982(a)(2), which states in

pertinent part the following:

### 18 U.S.C. § 982. Criminal Forfeiture

* * *

(a)(2) The Court, in imposing sentence on a person convicted of a violation of, or a
conspiracy to violate—

(a)  section . . . 1014 . . . of this title, affecting a financial institution . . .

shall order that the person forfeit to the United States any property constituting, or
derived from, proceeds the person obtained directly or indirectly, as the result of such
violation.

This Notice of Demand for Forfeiture includes but is not limited to the properties

described below in Paragraphs II, III, and IV.

### II.
### Properties

Any and all property constituting and/or derived from, or property used or intended to be

used in the commission of, the criminal offense.

### III.
### Money Judgment

**Money Judgment**:  A sum of money equal to One Hundred Seventy Million dollars

($172,000,000) that represents the value of the proceeds obtained directly or indirectly from the

violations charged in the counts set forth above, for which Defendant **Natin Paul a/k/a Nate**

**Paul** is liable.

## IV.
### Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set

forth above, as a result of any act or omission of the Defendant:

     a.     cannot be located upon the exercise of due diligence;
     b.     has been transferred or sold to, or deposited with, a third party;
     c.     has been placed beyond the jurisdiction of the Court;
     d.     has been substantially diminished in value; or
     e.     has been commingled with other property which cannot be divided
          without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property, up to the

value of the money judgment, as substitute assets, pursuant to 21 U.S.C. § 853(p) and Fed. R.

Crim. P. 32.2(e)(1).

A TRUE BILL

SIGNATURE REDACTED PURSUANT
TO E-GOVERNMENT ACT OF 2002

FOREPERSON


JAIME ESPARZA
UNITED STATES ATTORNEY


By: _____
ALAN M. BUIE
ASSISTANT UNITED STATES ATTORNEY


_____
ROBERT ALMONTE II
ASSISTANT UNITED STATES ATTORNEY


Indictment – *United States v. Natin Paul a/k/a Nate Paul*